UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 16-30021 |
| | ) | Chapter 7 |
| DANIEL VERNON ROGGENBUCK, II | ) | |
| SSN/ITIN xxx-xx-3330 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROBIN KAY ROGGENBUCK | ) | |
| SSN/ITIN xxx-xx-7861 | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| DANIEL VERNON ROGGENBUCK, II | ) | Adv. No. 17-3001 |
| and ROBIN KAY ROGGENBUCK | ) | |
| | ) | |
| Plaintiffs | ) | |
| -vs- | ) | DECISION RE:  COMPLAINT TO |
| | ) | DETERMINE DISCHARGEABILITY |
| SOCIAL SECURITY ADMINISTRATION | ) | |
| | ) | |
| Defendant. | ) | |

The matter before the Court is Debtors-Plaintiffs Daniel Vernon Roggenbuck, II and Robin Kay Roggenbuck's Complaint to Determine Dischargeability of Debt. This is a core proceeding under 28 U.S.C. § 157(b)(2). Following the trial held April 20, 2018, the Court enters these findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. For the reasons discussed below, Defendant Social Security Administration's pre-petition claim against Debtors-Plaintiffs is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(3).

I.

On August 4, 2009, Robin Kay Roggenbuck ("Roggenbuck") filed an application with the Social Security Administration ("SSA") on behalf of her and her husband Daniel Vernon Roggenbuck, II's minor child to receive Supplemental Security Income

("SSI").  The SSA provided Roggenbuck with an Application Summary for Supplemental Security Income dated August 13, 2009.  Under the section entitled REPORTING RESPONSIBILITIES FOR SUPPLEMENTAL SECURITY INCOME, the application summary stated:

> The amount of a Supplemental Security Income check is based on the information told to us.  You must tell Social Security every time there is a change while we process this application AND if the claimant starts receiving Supplemental Security Income.
>
> Remember, a change may make the SSI monthly payment bigger or smaller.  Report changes in income of an ineligible spouse who lives with the claimant, or the claimant's sponsor or sponsor's spouse if the claimant is an alien.  You must also report changes in things of value that these people own.  Report changes in income, school attendance and marital status of ineligible children who live with the claimant.
>
> You must tell us about any change within 10 days after the month it happens.  If you do not report changes, we may have to take as much as $25, $50, or $100 out of future checks.

In addition, the application summary contained a section entitled HOW TO REPORT CHANGES FOR SUPPLEMENTAL SECURITY INCOME.  That section provided (in relevant part):

> You can make your reports by telephone at the telephone number shown or you may report in person or by mail at the address shown. . . .  If you have any questions, we will be glad to help you.  See "Changes to Report for Supplemental Security Income[."]

The next section, entitled CHANGES TO REPORT FOR SUPPLEMENTAL SECURITY INCOME, listed various matters the applicant agreed to report to SSA.  One subsection provided (in pertinent part):

> [If the child] IS UMARRIED AND UNDER AGE 22 - - A report to Social Security must be made if:
>
> ○ [The child] is under age 18 and lives with you:  You should report if you have a change in income, a change in your marriage, a change in the

value of anything you own, or a change in your residence.

The SSA also gave Roggenbuck a Summary Statement of Income and Resources dated August 13, 2009. It contained paragraphs identical to the paragraphs from the Application Summary for Supplemental Security Income quoted above. Both the Application Summary for Supplemental Security Income and the Summary Statement of Income and Resources directed Roggenbuck to review the documents and advise SSA if she disagreed with any statement in either. Both documents also reminded Roggenbuck she had filed the application under penalty of perjury.

The SSA concluded the family, who was then living in Ohio, met the necessary income criteria and determined the Roggenbucks' child was eligible to receive SSI. SSA advised Roggenbuck of its decision by letter dated August 27, 2009. In the letter, SSA advised Roggenbuck, as the representative payee for their child, she was required to report to SSA if "income or resources for [their child] or members of [their child's] household change[.]" SSA enclosed with the letter two documents entitled Fact Sheet on SSI Federal Living Arrangement Categories and How Parents' Income and Resources Affect a Child's SSI. SSA provided similar information to Roggenbuck when SSA redetermined the child's eligibility in June 2010.

In the process of applying for and receiving SSI benefits on behalf of the Roggenbucks' child, Roggenbuck also received a pamphlet from SSA entitled What You Need To Know When You Get Supplemental Security Income (SSI). Therein, SSA stated SSI payments after the third monthly payment are "usually . . . based on your income from two months before." It also stated, "[I]f you receive more money than usual, you should call or visit your Social Security office. You must return any extra

money you are not supposed to get even if it is not your fault that you got it."  Much of the remainder of the pamphlet explained what kind of changes to an SSI recipient's living or financial situations had to be reported and how to report those changes.  The pamphlet said to report covered changes "within 10 days after the month it happens."  The Court was unable to find in the pamphlet a provision advising recipients or their designated payee that an income report had to be filed monthly.

In September 2010, Roggenbuck reported to SSA that the family had moved to Virginia.  In July 2011, she reported to SSA they had moved to North Dakota.  In October 2012, she reported to SSA the family had moved to South Dakota.  Roggenbuck made household income reports via "pay stubs" to the SSA office in South Dakota for September through December 2011, January through May 2012, November and December 2012, January and February 2013, September and October 2013, and April 2014.  The SSA received these pay stubs in batches every few months and issued Roggenbuck receipts.  Though the testimony was not entirely clear, it appears when Roggenbuck mailed pay stubs to the South Dakota SSA office, she included with them a cover sheet created and provided by SSA.  The cover sheet advised Roggenbuck, among other things:  to "[m]ail paystubs as soon as possible after the last payday of the month"; "[a]ny change affecting SSI benefits must be reported TIMELY to the Huron Social Office [sic] by the 10th day following the end of the month in which the change occurred"; and to report any "[c]hanges in the AMOUNT of income you already receive, including changes in wages received due to changes in hourly pay, hours worked, etc. (emphasis in original)."[1]

---

[1]Portions of the cover sheet admitted as an exhibit were difficult to decipher.

On June 12, 2014, SSA received from Roggenbuck pay stubs for April 2014. SSA did not receive any other reports from Roggenbuck in 2014. On January 2, 2015, SSA received from Roggenbuck two pay stubs for November 2014, one pay stub dated December 16, 2014, and another dated January 2, 2015. On both the December 16, 2014 and the January 2, 2015 pay stubs, Roggenbuck made a handwritten note indicating Daniel Roggenbuck had started a new job. SSA did not receive any more income reports from Roggenbuck in 2015 or in the first six months of 2016.[2] Thus, from May 2014 through June 2016, Roggenbuck only self-reported income information twice: the April 2014 pay stubs on June 12, 2014 and the November and December 2014 and January 2, 2015 pay stubs on January 2, 2015.[3]

The Roggenbucks filed a chapter 7 petition in bankruptcy on June 27, 2016. They did not schedule SSA as a creditor. The deadline for a creditor to seek a determination that its claim was excepted from discharge because it arose from fraud, as provided by 11 U.S.C. § 523(a)(2), (4), and (6) and § 523(c), was October 11, 2016.

In July 2016, SSA initiated a review to determine whether the Roggenbucks' child was still eligible to receive SSI. The Roggenbucks' file was selected for review by SSA's computer system. As part of this review process, SSA employee Laurie

---

[2]Roggenbuck testified she had regularly submitted pay stubs but SSA had failed to record them all. Daniel Roggenbuck testified he personally observed Roggenbuck mailing pay stubs to SSA "on . . . many occasions." Their testimony lacked credibility and was not supported by any documentation.

[3]SSA employee Laurie Walter testified SSA did not "post" the January 2, 2015 pay stub into the Roggenbucks' file when it was received because it did not comprise a full month's report.

Walter testified SSA looks at an SSI recipient's income and family living situation beginning from two years preceding the review to the current time. Thus, as part of this two-year look-back, SSA requested and Roggenbuck provided, on July 29, 2016, pay stubs for May 2014[4]–because the May 2014 income would determine the SSI paid in July 2014–through July 2016. After its receipt of these pay stubs, SSA concluded it had overpaid a total of $6,757.93 in SSI for the Roggenbucks' child for August 2014 to August 2016, excluding March 2016. SSA notified Roggenbuck of its conclusion on September 14, 2016.

Utilizing an SSA form, Roggenbuck requested a waiver, claiming the overpayment was not her fault because she had timely provided income information to SSA. The form was dated October 2, 2016. Roggenbuck did not mention her and her husband's bankruptcy case in this document. Though she stated on this form SSA had not properly recorded income information she had previously provided to SSA, Roggenbuck did not produce any additional receipts for income reports she had made to SSA that SSA had not already recorded before SSA initiated its review in July 2016.[5]

SSA finalized its overpayment decision on January 18, 2017 after Roggenbuck did not keep an appointment for a personal conference regarding the overpayment and Roggenbuck's waiver request. Roggenbuck did not appeal SSA's final decision. The overpayment that accrued before the Roggenbucks filed bankruptcy was

---

[4]A statement on SSA's exhibit 2 indicates SSA requested income reports beginning in April 2014; Walter testified SSA's request would have been for income reports beginning in May 2014.

[5]*See supra* note 2.

-6-

$6,282.39. The Roggenbucks have not reimbursed SSA for any of the overpayment.

No creditor, including SSA, timely sought a determination of the dischargeability of a claim. The Roggenbucks received a discharge of debts on October 12, 2016.

In the Roggenbucks' chapter 7 bankruptcy case, the trustee did not find any nonexempt assets to liquidate to pay creditors' claims, so creditors were never asked to file a proof of claim. The Bankruptcy Clerk closed the Roggenbucks' bankruptcy case on November 15, 2016.

A few months later, the Roggenbucks commenced this adversary proceeding against SSA. They asked the Court to declare, pursuant to 11 U.S.C. § 523(a)(3), SSA's pre-petition claim for the SSI overpayment was not excepted from discharge even though the Roggenbucks had not scheduled SSA as a creditor. SSA answered, arguing its claim was excepted from discharge under § 523(a)(3) because its claim was a product of fraud under 11 U.S.C. § 523(a)(2)(A). SSA eventually moved for summary judgment. The Court denied the motion. A trial was held April 20, 2018. The Court took the matter under advisement after receipt of the parties' post-trial briefs.

II.

Section 523(a)(3)(A) of the Bankruptcy Code provides a claim held by a creditor who did not receive notice of the case or have actual knowledge of the case is nonetheless discharged in a "no-asset" chapter 7 case unless the creditor's claim is found to fall under one of the fraud-based exceptions to discharge at 11 U.S.C. § 523(a)(2), (a)(4), or (a)(6). *Hadcock v. Myers (In re Hadcock)*, Bankr. No. 12-50034, Adv. No. 12-5008, 2012 WL 4959643, at *3 (Bankr. D.S.D. Oct. 17, 2012). In a

"no-asset" case, if the unscheduled creditor's claim *did* fall under § 523(a)(2), (a)(4), or (a)(6), the unscheduled creditor's claim will still be discharged under § 523(a)(3)(B) if the creditor had notice or actual knowledge of the case in time to seek a determination of the dischargeability of its claim. *In re Johnson*, 521 B.R. 912, 917 (Bankr. W.D. Ark. 2014).

> When all is said and done, § 523(a)(3) accomplishes two things. First, it protects the unscheduled creditor from having his claim discharged if he did not get notice of the case in time to file a proof of claim and file a nondischargeability complaint under § 523(a)(2), (4), or (6). *Mitchell v. Bigelow* (*In re Mitchell*), 418 B.R. 282, 286 (B.A.P. 8th Cir. 2009). Second, § 523(a)(3) ensures an unscheduled creditor is treated the same as other similarly situated creditors that the debtor remembered to put on his schedules. *Stefani v. Hiltz* (*In re Stefani*), Bankr. No. 05-40277, Adv. No. 07-4037, 2007 WL 1960591, *1 (Bankr. D.S.D. July 2, 2007) (citing *Hauge v. Skaar* (*In re Hauge*), 232 B.R. 141, 146-50 (Bankr. D. Minn. 1999)).

*Hadcock*, 2012 WL 4959643, at *3.

The debtor bears the burden of proving, by a preponderance of the evidence, the creditor had actual knowledge of the case in time to protect its claim. *Grogan v. Garner*, 498 U.S. 279 (1991); *Le Grand v. Harbaugh* (*In re Harbaugh*), 301 B.R. 317, 320-21 (B.A.P. 8th Cir. 2003). The creditor bears the burden of proving, also by a preponderance of the evidence, the claim would be excepted from discharge under § 523(a)(2), (4), or (6). *Hadcock*, 2012 WL 4959643, at *3*; Stefani v. Hiltz* (*In re Stefani*), Bankr. No. 05-40277, Adv. No. 07-4037, 2007 WL 1960591, at *2 (Bankr. D.S.D. July 2, 2007); and *Wright v. Gulf Ins. Co.* (*In re Wright*), 266 B.R. 848, 850-51 (Bankr. E.D. Ark. 2001).

The first step in resolving a complaint under § 523(a)(3) is to determine whether the debt was scheduled, *i.e.*, whether the creditor was served with the notice of the

commencement of the case. If not, the second step is to determine whether the creditor had actual knowledge of the bankruptcy case such that the creditor could have timely filed a complaint under 11 U.S.C. § 523(a)(2), (4), or (6). If not, the third step is to determine whether the creditor's claim would have been excepted from discharge under § 523(a)(2), (4), or (6) if a complaint had been timely filed. *See In re Wagner*, Bankr. No. 01-01490, 2008 WL 1968803, at *1 (Bankr. N.D. Iowa May 6, 2008). Finally,

> any evidence presented must be viewed consistent with the congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the [Bankruptcy] Code.

*Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1287 (8th Cir. 1987) (citing *Ray E. Friedman and Co. v. Jenkins* (*In re Jenkins*), 61 B.R. 30, 39 (Bankr. D.N.D. 1986)), *abrogated on other grounds, Grogan v. Garner,* 498 U.S. 279 (1991); *see The Merchants National Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790-91 (B.A.P. 8th Cir. 1999).

III.

There is no dispute the Roggenbucks did not include SSA on their original schedules of liabilities or their original case mailing list. There is no dispute the Roggenbucks never amended their schedules to add SSA as a creditor. The record shows and the parties agree the Bankruptcy Clerk did not serve the notice of the commencement of the Roggenbucks' chapter 7 bankruptcy on SSA, either when the case was commenced or at any time thereafter. There is also no dispute neither the Roggenbucks nor their bankruptcy counsel, prior to their complaint in this adversary proceeding, provided SSA with written notice that the Roggenbucks had filed a

-9-

bankruptcy case.  Thus, the first issue for the Court to determine is whether SSA had actual knowledge of the case before the October 11, 2016 deadline to file a fraud-based nondischargeability complaint.

Based on the record established at trial, the Court finds Roggenbuck, in her conversations with SSA employee Walter during the summer and early autumn of 2016, did not tell SSA Roggenbuck and her husband had filed a bankruptcy petition on June 27, 2016.  At trial, Roggenbuck first testified she told Walter three times they were in bankruptcy and that Walter responded rather indifferently.  On cross-examination, however, Roggenbuck stated she told Walter they were "in the process of filing bankruptcy" or similar words.  Roggenbuck later tried to refine her testimony to indicate she told Walter they had *actually filed* bankruptcy during these conversations, but her later testimony was less credible and less reliable than her testimony that she told Walter they were in the *process of filing* bankruptcy.

Daniel Roggenbuck testified he heard Roggenbuck tell Walter about their bankruptcy during a July 2016 telephone conversation between Roggenbuck and Walter.  He did not clarify whether Roggenbuck told Walter they had actually filed bankruptcy or were only in the process of filing bankruptcy.

Walter more credibly testified SSA's first knowledge the Roggenbucks had actually filed bankruptcy was acquired on January 17, 2017.  This knowledge came through a telephone message Roggenbuck left with Walter's co-worker.  In the telephone message, Roggenbuck said she would not be attending a conference scheduled that day regarding a waiver of the overpayment because Roggenbuck and her husband had filed bankruptcy and their attorney had advised them not to attend

the conference. Walter further testified SSA, in response to Roggenbuck's telephone message and consistent with its policy, wrote Roggenbuck, requested written documentation of their bankruptcy case, and advised Roggenbuck SSA would cease collection of the overpayment upon its receipt of the written documentation.[6] SSA's letter was made a part of the record at trial and confirms Walter's testimony regarding when SSA received actual knowledge of the bankruptcy case. There was no reliable evidence establishing SSA or Walter had received actual knowledge of the Roggenbucks' bankruptcy case in any other manner before January 17, 2017. Accordingly, the Court finds SSA did not have actual knowledge of the Roggenbucks' bankruptcy case before the October 11, 2016 deadline expired for SSA to file a fraud-based nondischargeability complaint.

The final issue the Court must resolve is whether SSA's pre-petition claim for the SSI overpayment would have been excepted from discharge under § 523(a)(2)(A)[7] if SSA had been able to timely file a nondischargeability complaint. The Court concludes the debt would not have been excepted from discharge under that provision.

Of the several elements SSA would have had to establish in a § 523(a)(2)(A)

---

[6] The Court's finding that SSA did not have actual knowledge of the Roggenbucks' bankruptcy case until SSA received Roggenbuck's telephone message on January 17, 2017 should not be considered a determination by the Court that SSA's in-house procedure, *i.e.*, requiring *written* documentation of a bankruptcy case before referring the matter to an SSA attorney and ceasing collection of an overpayment, comports with the bankruptcy code.

[7] This is the specific fraud-based nondischargeability code section SSA referenced in its answer and its other documents filed in this adversary proceeding.

action,[8] SSA would have been unable to show it justifiably relied on the incomplete income information Roggenbuck had provided to SSA during the time the overpayments were made.[9]

> "Justifiable reliance is an intermediate standard between actual reliance and reasonable reliance." [*R & R Ready Mix v. Freier* (*In re Freier*), 604 F.3d 583, 588 (8th Cir. 2010)] (citing *Field* [*v. Mans*, 516 U.S. 59, 70-73 (1995)]). A determination of justifiable reliance depends on the creditor and the facts of the particular case. *Islamov v. Ungar* (*In re Ungar*), 633 F.3d 675, 679 (8th Cir. 2011) (citing *Field*, 516 U.S. at 71, 116 S.Ct. 437 (quoting RESTATEMENT (SECOND) OF TORTS (1976) § 545A, Cmt. b)). Reliance may be justifiable even when an investigation would have revealed the representation's falsity. *Freier,* 604 F.3d at 588 (citing *Field*, 516 U.S. at 74-75, 116 S.Ct. 437). Reliance is not justified when a creditor "blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*. (citing *Field*, 516 U.S. at 71, 116 S.Ct. 437) (quoting RESTATEMENT (SECOND) OF TORTS (1976) § 541, Cmt. a).

*Community Finance Group, Inc. v. Fields* (*In re Fields*), 510 B.R. 227, 236 (B.A.P. 8th

---

[8]The elements of § 523(a)(2)(A) are: (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made. *Community Finance Group, Inc. v. Fields* (*In re Fields*), 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014) (quotations and citations therein omitted). Further, under § 523(a)(2)(A) the representation must be "other than a statement respecting the debtor's or an insider's financial condition[.]" *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752 (2018).

[9]In light of this finding, the Court need not address the other elements of § 523(a)(2)(A), including whether the Roggenbucks' failure to submit income reports–their silence when obligated to report income information–is actionable under § 523(a)(2)(A). *See Appling*, 138 S.Ct. 1752, and *supra* note 8. In *Appling*, the Court held a debtor's misrepresentation about a single asset can be a "statement respecting a debtor's financial condition," but it must be in *writing* to be actionable under 11 U.S.C. § 523(a)(2)(B). The United States Supreme Court entered its opinion in *Appling* after the Roggenbucks and SSA filed their post-trial briefs and, therefore, it was not discussed by either party.

Cir. 2014). Here, SSA continued to make regular SSI payments although Roggenbuck had not submitted monthly income reports for much of 2014 and had submitted only one pay stub for 2015 and the first few months of 2016. SSA contacted Roggenbuck and directed her to supplement its file only after SSA commenced a computer-generated file review in July 2016. Further, Walter testified SSA will, when income verification is not received, continue paying SSI based on estimates that are usually calculated from information in the file. Under these circumstances, the Court cannot find SSA's reliance on the incomplete income reports from Roggenbuck or, stated another way, SSA's reliance on Roggenbuck's silence for 17 months via a failure to submit regular income reports, was justifiable. *See, e.g., United States v. Evans* (*In re Evans*), 584 B.R. 20, 28 (Bankr. E.D. Mo. 2018) (SSA was not required to investigate a debtor's actual work status unless there were warning signals that would indicate the debtor was deceiving the SSA). That the SSA office in South Dakota has a policy of requiring an SSI recipient to submit monthly income information and a second policy of continuing to issue SSI benefits although it has incomplete income information from an SSI recipient does not transform SSA's reliance on the incomplete information into justifiable reliance.

Certainly, other courts have found SSA's monumental task of determining who is eligible for SSI and then making those payments in the correct amount weighs in favor of finding SSA's reliance on a less than complete income record is justifiable. *See, e.g., Evans,* 584 B.R. at 28 ("It is clear that the SSA relies on benefit program participants to self-report to maintain the accuracy of its records and avoid overpayment[, and] it would be burdensome for the SSA to investigate the millions of

benefit recipients who participate in the program."); *United States v. Drummond* (*In re Drummond*), 530 B.R. 707, 710 (Bankr. E.D. Ark. 2015) (justifiable reliance found where the debtor did not advise SSA she had returned to work), *cited regarding different point of law in Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1763 n.4 (2018).  However, even after recognizing Roggenbuck's promise to the South Dakota SSA office to provide monthly income reports and even after allowing the South Dakota SSA office–due to its higher than average SSI caseload–some lag time between recognizing it had an incomplete income record and adjusting the amount of SSI paid or halting the payment of SSI, at some point in the 17 months between mid-January 2015, when Roggenbuck last submitted an income report on her own, and the Roggenbucks' June 27, 2016 petition date, a red flag was raised that SSA should have heeded before making additional overpayments.  Accordingly, the record does not show SSA would have been able to establish the justifiable reliance element of § 523(a)(2)(A), especially where the provisions of § 523(a) must "be narrowly construed against the creditor and liberally against the debtor[.]" *Van Horne*, 823 F.2d at 1287.

The Court notes the SSI program documents SSA gave Roggenbuck emphasized the requirement for Roggenbuck to report specific changes in income or the family's living situation as they occurred, rather than emphasizing a requirement for Roggenbuck to file monthly income reports regardless of any changes.  Both Roggenbuck and Walter, however, testified Roggenbuck understood she was to submit monthly income reports consistent with the procedures of the South Dakota SSA

office.[10]  Were income reports in fact required to be submitted only when there was an actual change in income, SSA's reliance on Roggenbuck's lack of income reports after January 2, 2015, when Roggenbuck reported her husband's job change, might have been justified.

Finally, in trying to preserve its claim, SSA has stood firmly on the lack of due process arising from the Roggenbucks' failure to schedule it as a creditor.  These due process concerns, however, were resolved by this adversary proceeding, which created an opportunity for SSA to be heard regarding the dischargeability of its pre-petition claim under § 523(a)(2)(A), the same opportunity SSA would have had in this no-asset chapter 7 case if the Roggenbucks had scheduled SSA as a creditor.  *See, e.g., In re Rollison,* 579 B.R. 67, 74 n.12 (Bankr. W.D. Va. 2018) ("[T]o satisfy constitutional due process, the omitted creditor may challenge the dischargeability of his debt after the expiration of the deadline for other creditors . . . [and] may do so in any appropriate forum."); *Ward Hardwood Floor Service, Inc. v. Jenkins* (*In re Jenkins*), 434 B.R. 604, 610 (Bankr. D. Colo. 2010) (quotation and citations therein omitted) (a fundamental requisite of due process is the opportunity to be heard).

> [I]f the debtor fails to schedule a debt and the creditor does not learn of the bankruptcy case in sufficient time to protect its rights, *the creditor['']s debt will not be discharged unless further proceedings are held*. Specifically, a debtor may . . . obtain a determination of dischargeability of the obligation.  In this manner, the creditor, whose due process rights

---

[10]Daniel Roggenbuck testified his wife and he had an obligation "to mail in our pay stubs"; he did not use the word "monthly."  His other testimony reflected an understanding the pay stubs were to be submitted monthly.

are protected through service of a summons and complaint, is afforded
the opportunity to assert grounds it may have for the nondischargeability
of the debt.

*Wright*, 266 B.R. at 850 (citation therein omitted) (emphasis added).

An order will be entered directing the entry of a judgment declaring SSA's pre-petition claim of $6,282.39 is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(3).

Dated: July 24, 2018

BY THE COURT:

Charles L. Nail, Jr.
Bankruptcy Judge

NOTICE OF ENTRY
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota